1  CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
2    Edward D. Chapin, Esq. (SBN: 053287)
     Francis A. Bottini, Esq. (SBN: 175783)
3    Douglas J. Brown, Esq. (SBN: 248673)
   550 West "C" Street, Suite 2000
4  San Diego, California  92101
   Tel:  (619) 241-4810
5  Fax:  (619) 955-5318

6  Attorneys for Plaintiff Douglas J. Campion

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11 DOUGLAS J. CAMPION, on behalf of        )
12 himself and all others similarly situated,  )  Case No.:  09cv0748 JMA (NLS)
                                            )
13              Plaintiff,                   )  **DECLARATION OF FRANCIS A.**
        vs.                                 )  **BOTTINI, JR. IN SUPPORT OF**
14                                          )  **PLAINTIFF'S OPPOSITION TO**
   OLD REPUBLIC HOME PROTECTION            )  **DEFENDANT'S MOTION FOR**
15 COMPANY, INC., a                         )  **SUMMARY JUDGMENT**
16 California Corporation, and DOES 1-25,   )
   Inclusive                               )  Date:  January 20, 2012
17                                          )  Time:  10:00 a.m.
              Defendant.                    )  Dept.: D
18                                          )  Judge: Honorable Jan M. Adler
                                            )
19 _____ )

20

21      I, Francis A. Bottini, declare as follows:

22      1.      I am a partner with the law firm of Chapin Fitzgerald Sullivan & Bottini LLP,

23 counsel for Plaintiff Douglas Campion ("Plaintiff").  I am licensed to practice law before this

24 Court and in all courts in the State of California.  I have personal knowledge of the facts stated

25 below.  If called upon to do so, I could and would competently testify thereto.

26      2.      Attached as **Exhibit A** is a true and correct copy of the excerpts of the

27 deposition of Douglas J. Campion, taken on June 9, 2010, as cited in Plaintiff's Memorandum

28 of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment.

                                    - 1 -                    09cv748 JMA (NLS)

1   Plaintiff testified that he made a claim with Old Republic regarding his garbage disposal, paid a

2   $50 service call fee, and then had to pay $300-$400 more out of his pocket to buy a new

3   garbage disposal and have it installed after Old Republic improperly rejected his claim.

4       3.   To determine if Defendant Old Republic is licensed to sell insurance in the State

5   of California, I checked with the California Department of Insurance.  Old Republic does not

6   possess a license to sell insurance.  Attached hereto as **Exhibit B** is a true and correct copy of a

7   printout from the website of the California Department of Insurance reflecting that the search

8   results show that no license for Old Republic to sell insurance exists in the State of California

9       4.   Attached hereto as **Exhibit C** is a true and correct copy of a page from the

10   "FAQ" section on Old Republic's website answering the question of "What is a home

11   warranty?"

12       5.   Attached hereto as **Exhibit D** is a true and correct copy of the Order Granting In

13   Part and Denying In Part Defendant's Motion to Dismiss (September 21, 2009) in *Diaz v. First*

14   *American*, Case No. 09-CV-0775 H (WMC) (U.S. Distr. Court, S.D. Cal.).

15       6.   Attached hereto as **Exhibit E** is a true and correct copy of an Order Overruling

16   Demurrer in *Edleson v. American Home Shield*, (October 19, 2007) Case No. 37-2007-

17   00071725-CU-BT-CTL (San Diego Superior Court).

18       7.   Attached hereto as **Exhibit F** is a true and correct copy of correspondence dated

19   August 31, 2004 to the California Department of Insurance from the Home Warranty

20   Association of California.

21

22       I declare under penalty of perjury under the laws of the United States that the foregoing

23   is true and correct.  Executed this 6th day of January, 2012, at San Diego, California.

24

25                            s/Francis A. Bottini, Jr.
                           Francis A. Bottini, Jr.

26

27

28

DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INDEX OF EXHIBITS
## TO DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF
## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.      **Exhibit A:**

            Excerpts of the deposition of Douglas J. Campion, taken on June 9, 2010.

2.      **Exhibit B:**

            Printout from the website of the California Department of Insurance.

3.      **Exhibit C:**

            "FAQ" section on Old Republic's website answering the question of "What is a home warranty?"

4.      **Exhibit D:**

            Order Granting In Part and Denying In Part Defendant's Motion to Dismiss (September 21, 2009) in *Diaz v. First American*, Case No. 09-CV-0775 H (WMC) (U.S. Distr. Court, S.D. Cal.).

5.      **Exhibit E:**

            Order Overruling Demurrer in *Edleson v. American Home Shield*, (October 19, 2007) Case No. 37-2007-00071725-CU-BT-CTL (San Diego Superior Court).

6.      **Exhibit F:**

            Correspondence dated August 31, 2004 to the California Department of Insurance from the Home Warranty Association of California.

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS J. CAMPION, On Behalf of ) | |
| Himself and All Others Similarly ) | |
| Situated, ) | |
| ) | |
|       Plaintiffs, ) | |
| ) | Case No.: |
|   vs. ) | 09-cv-0748 JMA (NLS) |
| ) | |
| OLD REPUBLIC HOME PROTECTION ) | |
| COMPANY, INC., a California ) | |
| corporation, and DOES 1-25, ) | |
| Inclusive, ) | |
| ) | |
|       Defendants. ) | |
| _____ ) | |

DEPOSITION OF DOUGLAS J. CAMPION

San Diego, California

JUNE 9, 2010

REPORTED BY BRIDGET L. MASTROBATTISTA

REGISTERED MERIT REPORTER, CSR NO. 7715

Peterson Reporting, Video & Litigation Services

1

A-5

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF CALIFORNIA
3
4 DOUGLAS J. CAMPION, On Behalf of )
  Himself and All Others Similarly  )
5 Situated,       )
            )
6   Plaintiffs,    )
        ) Case No.:
7  vs.     ) 09-cv-0748 JMA (NLS)
         )
8 OLD REPUBLIC HOME PROTECTION  )
  COMPANY, INC., a California  )
9 corporation, and DOES 1-25,  )
  Inclusive,      )
10        )
   Defendants.   )
11 _____)
12
13
14   DEPOSITION OF DOUGLAS J. CAMPION,
15 taken by the Attorneys for the Defendants, commencing at
16 the hour of 10:11 a.m. on Wednesday, June 9, 2010, at
17 501 West Broadway, Suite 1720, San Diego, California,
18 before Bridget L. Mastrobattista, Registered Merit
19 Reporter, CSR No. 7715, in and for the State of
20 California.
21
22
23
24
25

2

---

1 APPEARANCES:
2
3  For the Plaintiff:
4  JOHNSON BOTTINI, LLP
   BY: FRANCIS A. BOTTINI, JR., ESQ.
5    BRETT M. WEAVER, ESQ.
   501 West Broadway, Suite 1720
6  San Diego, California 92101
   619.230.0063
7
  For the Defendants:
8
  FOLEY & LARDNER, LLP
9  BY: CHAD R. FULLER, ESQ.
   TAMMY H. BOGGS, ESQ.
10  11250 El Camino Real, Suite 200
  San Diego, California 92101
11  858.847.6700
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

---

1     I N D E X
2
 WITNESS: DOUGLAS J. CAMPION
3
4 EXAMINATION     PAGE
5 BY MR. FULLER     5
6    E X H I B I T S
7 FOR DEFENDANTS:    MARKED
8 47 Document entitled "Declaration of 66
   Douglas J. Campion in Support of
9   Plaintiff's Motion for Class
   Certification"
10
  48 Letter dated 3/3/208 to Douglas 75
11   Champion
12  49 Documents produced by Mr. Campion 83
13  50 Old Republic documents, Bates 98
   stamped OR003188 through 3218
14
15    E X H I B I T S
16 PREVIOUSLY MARKED:   REFERENCED
17 46 Class Action Complaint  77
18
19
20
21
22
23
24
25

4

---

1   DOUGLAS J. CAMPION,
2 having been first duly sworn, testified as follows:
3
4   EXAMINATION
5 BY MR. FULLER:
6  Q Good morning, Mr. Campion.  How are you?
7  A Good.
8  Q My name is Chad Fuller, and I represent
9 Old Republic and --
10   MS. BOGGS:  Tammy Boggs representing
11 Old Republic.
12 BY MR. FULLER:
13  Q And we're here today to ask you some questions
14 about a case that you filed against Old Republic, a
15 class action -- a putative class action entitled
16 "Campion versus Old Republic Home Protection Company."
17 Okay?
18  A Okay.
19  Q You're a lawyer?
20  A I am.
21  Q And how many depositions do you think you've
22 taken in your career, 33 years?
23  A Oh, gosh, I don't know.  Hundreds.  Hundreds.
24 I'm familiar with the ground rules if that's what you're
25 getting at.

5

**Page 34**

1  standing in the kitchen.
2       And he looked underneath the sink, and all I
3  remember then is, you know, few minutes later he was
4  done and he said he would have to get back to me.
5  Q   Okay.
6  A   I was kind of surprised because I thought it
7  was going to be fixed that day.
8  Q   Did he say anything more besides I'm going to
9  have to get back to you on this or words to that effect?
10  A   Well, he said something about he has to go to
11  Old Republic and have them approve it or have the repair
12  approved.  And whether or not -- whether he said
13  anything else, I don't know.
14  Q   You know today that that, in fact, was Oasis
15  Plumbing, obviously, the contractor that came out to
16  your home.  Did you remember it being Oasis Plumbing at
17  the time?
18  A   I don't understand the question.
19  Q   Sorry.
20       MR. FULLER:  Did you?
21  BY MR. FULLER:
22  Q   All right.  At the time the guy came out --
23  initially came out to your house, did you know that he
24  was with Oasis Plumbing?  Did he somehow identify
25  himself of -- with the name of the company?

**Page 35**

1  A   Well, before he would start working, he wanted
2  a $50 check, I think it was, and he gave me that sheet
3  of paper as a receipt.  So I knew he was from a company
4  named Oasis and had their identifying information on it.
5  Q   So he leaves.  You write him the 50 -- you
6  handed him the check --
7  A   Yes.
8  Q   -- for $50?  He performs his analysis.  He says
9  he's going to have to check with Old Republic, and he
10  leaves, correct?
11  A   That's correct.
12  Q   And what's the next thing that happened, if you
13  recall?
14  A   I don't know if he called or if Old Republic
15  called me.  Somebody called and said they were going to
16  deny the claim.
17       I thought it was him, but it may have been both
18  of them.  It may have just been Old Republic that called
19  and said they denied the claim because of a -- they said
20  the gasket was improperly installed when the -- I guess
21  is when it was originally installed, I don't know,
22  but -- and then I disputed that.
23  Q   Okay.  So let's drill on that just for a
24  second.
25       You said someone called you and said that the

**Page 36**

1  claim had been denied and -- for improper installation,
2  and you said that you disputed that.
3       How did you dispute that, Mr. Campion?
4  A   Well, I remember speaking to somebody from
5  Old Republic, and it may have been in that call or may
6  have been maybe they left messages and I called them
7  back or maybe it was the guy himself, but I know I
8  called Old Republic and said, "Why are you denying the
9  claim?  What is the reason?"
10       And they explained it, and I said what does a
11  gasket -- installation of a gasket between the garbage
12  disposal and the sink have to do with the inside
13  electrical problem that's causing it not to work?
14       The gasket's been that way for the last ten
15  months or eight months that I've been in the house,
16  didn't see any tie-in between their alleged improper
17  installation and the garbage disposal going out.
18       And I said it could have been there for years,
19  for all I knew, because I just moved in the house.  And
20  I was very upset that they were using that -- as I saw
21  it as an excuse to deny the claim.
22  Q   And do you remember what, if anything, they
23  said to you?
24  A   Well, they explained it was in the policy or
25  something to that effect.  I asked them to send me the

**Page 37**

1  policy and they did.  And they said -- I said, "Is
2  there" -- I think I might have asked if there was
3  anybody else I could talk to, and they basically said
4  no.
5  Q   And did they tell you, look, it's not covered.
6  You know, we would -- we could send somebody out to pay,
7  you know, and then you could just pay whatever to have
8  them to replace the garbage disposal or fix it?
9       Do you remember any of those kinds of words?
10       MR. BOTTINI:  Objection to the form of the
11  question.
12       MR. FULLER:  He didn't like my form.
13       THE WITNESS:  Can you rephrase?
14       MR. FULLER:  Wouldn't be my first day.
15       THE WITNESS:  Can you restate it, please?
16  BY MR. FULLER:
17  Q   Yeah.  Did anybody on the -- do you recall
18  anybody telling you, look, we'll send -- we can find a
19  contractor for you that is not covered to help fix your
20  problem?
21       MR. BOTTINI:  Objection to the form of the
22  question.
23       THE WITNESS:  Could you -- I'm sorry, could you
24  rephrase it again, maybe.
25  BY MR. FULLER:

A-7

1    Q   Yeah. The question has to do with did they
2  offer -- did they offer services or to help you find a
3  contractor that would not be covered, but just to help
4  you, you know, find a contractor to resolve the garbage
5  disposal issue?
6         MR. BOTTINI: Same objection.
7         THE WITNESS: I don't recall that we ever came
8  to that point in the conversation, because I didn't want
9  anything to do with them, pretty much.
10        I mean, if they're not going to honor the
11 contract, I figured I'm not going to use them as a
12 source to get somebody to pay for something that I
13 thought was covered. I will go outside and get my own
14 guy.
15 BY MR. FULLER:
16   Q   What about -- what about the Oasis? Would you
17 have been inclined to use Oasis, to call Oasis back to
18 replace the garbage disposal?
19   A   Not at all.
20   Q   Why not?
21   A   He's the one that told -- that was working in
22 cahoots with them to deny my claim. So I didn't want
23 somebody who was basically going to say you don't have a
24 covered claim to come out and fix my -- fix my garbage
25 disposal.

38

1    Q   When the guy was there, the guy from Oasis, did
2  he say to you anything like, "I don't think it's
3  covered, but -- but I can fix it. You know, I can take
4  the thing out to my truck and fix it off the books"?
5    A   No. He said he had to check with Old Republic.
6  He -- you know, he would get back to me.
7         And I was just assuming it was going to be
8  covered, and perhaps he was assuming it was going to be
9  covered or he was assuming it wasn't going to be
10 covered, but he didn't take any effort to do anything
11 until we got the word from Old Republic.
12        And I -- we didn't -- we didn't have that
13 discussion at all.
14        MR. BOTTINI: Just whenever you get a chance so
15 we can take a bathroom break.
16        MR. FULLER: Yeah. Sure.
17        THE WITNESS: I would like that.
18        MR. FULLER: Let's do it.
19        MR. BOTTINI: You can finish your line of
20 questioning.
21        MR. FULLER: That's fine. You can go ahead.
22 Off the record.
23        (A recess was taken.)
24        MR. FULLER: Back on the record.
25        Mr. Campion, before we took our break, we were

39

1  talking a little bit about when the repairman came out
2  to the house to take a look at your garbage disposal,
3  and I had asked you if you were inclined to use them for
4  the future repair and you said, no.
5         And you said some words to the effect that why
6  would I use them if they were in cahoots with the
7  company that -- you know, with Old Republic that denied
8  the claim.
9         So In Cahoots, by the way, is a bar in San
10 Diego, and I don't think that's what you meant. So...
11   A   Working with. Working with --
12   Q   In concert.
13   A   -- as the agent of. Old Republic, yeah.
14   Q   Okay. And do you have any -- do you have any
15 basis to believe that Oasis was somehow working with or
16 in cahoots with Old Republic to deny your claim?
17   A   Well, all I can base it on is what he did. He
18 came out and he looked at it. They denied my claim.
19 They did it based on the information that he provided.
20 So there wasn't anything that I told them. It was all
21 based on what he told them.
22   Q   But, I mean, do you -- do you have an
23 understanding or a belief that the plumber that came
24 out, the contractor Oasis, was incentivized somehow by
25 Old Republic to deny your claim?

40

1    A   Those are the allegations in the complaint.
2    Q   Yeah. I'm just asking you if you have an
3  understanding.
4    A   Well, that's my understanding.
5    Q   Okay. How are they incentivized, do you know?
6    A   Well, I'm -- I read the complaint. I'm relying
7  on what -- what -- the investigations of counsel. And
8  you want me to repeat what's in the complaint?
9         It says they're incentivized to deny claims so
10 that they can sell you the same services outside the
11 plan and make money off of that or incentivized to do
12 Band-Aid repairs so they have to -- so you have to be
13 calling them again to come out a few months later and
14 pay them another $55, that type of thing.
15   Q   When the claim was denied and you called
16 Old Republic and they said, well, it's been denied and
17 you said, I don't think that's right, and then they
18 said, well, that's our determination.
19        After that telephone call, what was the next
20 thing that you did, if you remember, in connection with
21 the denial of this claim?
22   A   I think I waited for them to send me a copy of
23 the policy.
24   Q   Okay.
25   A   They said they were going to send me in the

41

A-8

1   be a reason for it.
2   A   Certainly.
3   Q   Okay. And if there was a proper denial, is
4   that a problem? Do you have a problem with the fact
5   that there might be a circumstances where there's a
6   proper denial?
7   A   Can you rephrase that again?
8   Q   Yeah. Sure.
9       I mean, you understand -- do you think it would
10  be reasonable that under certain circumstances a company
11  would properly deny claims?
12  A   Yes.
13  Q   And with respect to you, the reason that you're
14  sitting here today is because you believe the company
15  improperly denied your claim, correct?
16  A   Yes.
17  Q   Had they repaired the garbage disposal or
18  replaced it, you wouldn't be sitting here today,
19  correct?
20  A   I think that's correct.
21  Q   Okay. And you didn't have a problem with the
22  range stop. You felt that the service call or the
23  policy lived up to your expectations, correct?
24  A   Well, they did what they said they were going
25  to do. They fixed it when it broke down.

50

1   A   But I didn't necessarily intend to file a
2   lawsuit at the time.
3   Q   And then the garbage disposal, so, what, did --
4   somebody came out and replaced the garbage disposal? Is
5   that what happened?
6   A   Basically, yeah.
7   Q   And do you remember who you called?
8   A   Well, let's see. His name was Jacob, and he
9   replaced the garbage disposal when he did a lot of other
10  jobs to my house as part of doing three or four other
11  things as well.
12  Q   Okay. Was Jacob -- is he an independent
13  contractor?
14  A   Well, he has his own company. He's a licensed
15  contractor.
16  Q   Okay. And do you know the name of his company?
17  A   I'm trying to picture it. It might have his
18  name in it, Jacob something, but I don't know off the
19  top of my head, because I just call him Jacob.
20  Q   Okay. So you had him do three or four other
21  things.
22      By the way, were these three or four other
23  things something that you had made a claim on or were
24  they just different types of things?
25  A   Just things I needed to do around the house.

52

1   Q   Okay. So you call the -- by the way, we'll --
2   so you called the Johnson Bottini firm, and they take
3   the case.
4       And after you called -- at some point you
5   replaced this garbage disposal, correct?
6   A   That's correct.
7   Q   And do you remember when you did that?
8   A   I don't. It was a period of time after the
9   February time period. I mean, I didn't run out and
10  replace it immediately. Just sat there.
11  Q   Okay. Did you call the Johnson -- did you
12  replace the garbage disposal before or after you called
13  the Johnson Bottini firm?
14  A   I think it was before.
15  Q   At the time you replaced the garbage disposal,
16  did you think: I might have a claim against this
17  company?
18  A   I thought that after I hung up when they were
19  denying the claim.
20  Q   You thought: I could -- I have a claim -- I
21  potentially have a claim against this company?
22  A   I thought they didn't live up to their promises
23  in the contract. So I guess if you characterize that as
24  having a claim.
25  Q   Okay.

51

1   And I said, okay, while you're here, I need this fixed
2   and that fixed and pointed out different things. And it
3   included the garbage disposal. And he gave me a price
4   to do it all.
5   Q   And at the time Jacob came out to the house and
6   you pointed these things out for him and he undertook
7   this work, had you contacted Frank Bottini at that time?
8   A   I don't think so.
9   Q   Did you think that potentially this garbage
10  disposal might be evidence in a case?
11  A   At the time I replaced it?
12  Q   Yes, sir.
13  A   No. No.
14  Q   Did you ask Jacob to look -- let me ask it a
15  different way. Did you tell Jacob this garbage disposal
16  issue had been improperly, based on your belief, denied
17  by Old Republic?
18      MR. BOTTINI: Objection to the form of the
19  question.
20      THE WITNESS: I don't recall having any such
21  conversation with him. It didn't affect him at all.
22  BY MR. FULLER:
23  Q   I know, but did you say, "Hey, look at this.
24  These folks said that this thing was improperly
25  installed. Can you verify that for me"?

53

. . .

1    A   No. I'm sure I didn't say anything like that.
2    Q   Okay. Were you curious as to what Jacob
3  believed about the installation of the garbage disposal?
4    A   Not at all. Because he, you know, pointed out
5  the things, and, you know, how much for this and how
6  much for that and how much for all of it together, and
7  he wrote things down and came back to me and gave me a
8  price.
9        Because I remember he was going to charge me
10  around $100 to replace the garbage disposal. And I
11  bought a new garbage disposal and put it in.
12    Q   You bought the garbage disposal or Jacob did?
13    A   I did.
14    Q   And you bought it at Sears?
15    A   I did.
16    Q   Okay. Do you know what Jacob did with the old
17  garbage disposal?
18    A   Probably took it away with all of the other
19  garbage that they took out of the house when they were
20  doing the other jobs.
21    Q   I've got to ask you. I think I know the
22  answer. I'm going to ask you: You didn't take any
23  pictures underneath of the garbage disposal?
24    A   No, not that I recall.
25    Q   Okay.

54

1    A   No, I don't think so. I didn't.
2    Q   All right. And do you think that Jacob might
3  have or probably didn't or do you know one way or the --
4    A   I know he wouldn't have done something like
5  that. Time is money to him. And get in, get out,
6  fixed.
7    Q   Do you recall whose idea this was to bring this
8  complaint, to bring it as a class action?
9    A   I don't know.
10    MR. BOTTINI: Yeah, I mean, object to the form
11  of the question, and are you -- if you -- I think you're
12  getting to an area that intrudes on the attorney-client
13  privilege. So if you can clarify your question and go
14  ahead, but --
15    MR. FULLER: All right. Let --
16    MR. BOTTINI: Are you asking him for
17  something -- discussions with his counsel?
18  BY MR. FULLER:
19    Q   Let me ask you: When you were driving over or
20  getting ready to pick up the phone to call the
21  Johnson Bottini law firm, did you think, hey, I have a
22  class action here or were you thinking, hey, I want my
23  individual issue resolved by these folks? Do you -- if
24  you remember.
25    A   Well, I would assume if I was going to just

55

1  resolve it individually, I would have been in Small
2  Claims Court a long time before that, but I was just --
3  I was calling them based upon their other action, which
4  was a class action. So maybe I was assuming it was a
5  class-action-type case.
6    Q   All right. So if you -- like who were the
7  other members of the class that you are representing?
8    A   Well, the class definition was originally all
9  the people who made a claim against Old Republic. I
10  think the date was originally in 2008, but I think it
11  would go back to 2003 in the complaint.
12        And I think the amended complaint, the proposed
13  amended complaint includes people that also bought a
14  policy from Old Republic and/or made claim.
15    Q   So if you simply bought a policy from
16  Old Republic, you're part of the class?
17    A   I think that's what the proposed amended
18  complaint says.
19    Q   Why would you be a part of the class if you
20  just bought a policy?
21    A   I think the allegations of the complaint are
22  that there were misrepresentations.
23    MR. BOTTINI: Okay. I'm just going to object.
24  It calls for a legal conclusion.
25  BY MR. FULLER:

56

1    Q   Okay. Go ahead.
2    A   Should I answer?
3    MR. BOTTINI: You can answer, if you -- if you
4  can answer the question, go ahead.
5    THE WITNESS: Well, I just understand that it's
6  not just on the denial of the claims, but the
7  misrepresentations in the advertising and the policies
8  themselves saying you're going to get something that you
9  ultimately don't get.
10        So it's anybody who bought a policy and may not
11  have made a claim, but they were harmed as well. Again,
12  that's just my understanding after reading the
13  complaint.
14  BY MR. FULLER:
15    Q   So is it your understanding that somebody is
16  harmed by Old Republic the minute they buy a policy?
17    MR. BOTTINI: Well, again, object that it calls
18  for a legal conclusion. I mean, if you want to ask him
19  if he has any personal knowledge about something, go
20  ahead. If you are asking him for legal conclusions or
21  what the legal effect of some allegation in the
22  complaint is, then that's not a proper question.
23    MR. FULLER: I actually like my question a lot.
24  I kind of dig it, Frank, so I'm going to let the
25  question stand, and you can either make your objection

57

# EXHIBIT B

## License Name Search

Searching our database of licensees can be accomplished in one of two ways.

If you are using the proper name of an individual ('John Public', for example), enter the last name first, followed by a space, and the first name, (as in 'Public John'). You may search by last name only or last name and first initial ('Public' or 'Public J', for example).

For other searches, such as aliases, type the name including spaces (as in 'Public Insurance Agency').

**Tip:** The more specific your search criteria, the faster the data will be returned.

Enter query criteria for License Status - Name Search

License Name: old republic home protection company

[ Submit Query ]  [ Reset Input ]

Avoid Delays! Do you need to renew your license? Go to FREE APPLICATION ONLINE RENEWAL SERVICE to renew your license now!

Need Help?

Last Revised - July 29, 2011 11:32 AM
Copyright © California Department of Insurance

B-12

# Name Search Results

### Disclaimer

The license status information shown below represents information taken from the CDI licensing database at the time of your inquiry.This information may not always be current. For example, items sent to the Department may be pending review or simply may not have been entered into our licensing database yet. Continuing Education hours quoted may not reflect courses taken in the last 45 days. This database will reflect concluded disciplinary actions against licensees. Complaints and ongoing investigations are confidential and, therefore, not available.

**Glossary of Terms**

No Records returned

Search Again

If no names appear, your search did not find any matches. Please return to the Name Search and try again.

---

Last Revised - July 29, 2011 11:32 AM
Copyright © California Department of Insurance

# EXHIBIT C

Case 3:09-cv-00748-JMA-NLS   Document 85-1   Filed 01/06/12   Page 15 of 41
Old Republic Home Protection - Home Warranty Service

Page 2 of 2

# Homeowners » Questions

Q:
Who is a home warranty?
A:
The standard home warranty is a one-year service contract that protects a resale
home buyer or current homeowner against the cost of unexpected repairs or
replacement of major systems and appliances that break down due to normal
usage. Coverage is also available to home sellers during the listing and escrow
period to help them keep unforeseen breakdowns from potentially delaying the
close of sale.

Q:
Do you need to be buying or selling a home to get a home warranty?
Q:
How does a home warranty help me?
Q:
Does Old Republic Home Protection require an inspection?
Q:
What if I need service?
Q:
Who handles the repairs?
Q:
Do home warranty plans cover appliance or system replacement?
Q:
What is the difference between my homeowner insurance policy and a home
warranty plan?
Q:
Can I renew each year?

I would like to thank the Old Republic rep for all her help this past weekend.
My A/C decided to blow up and she was very helpful in finding an HVAC
company that came out on Saturday. I can't thank her enough, especially
during this hot Texas weather we've been having. Luckily, my family and I
were without the A/C for only one night. It could have easily been two or
three nights. Thanks again!

D.M., Plan Holder, Grand Prairie, TX

Home | About Us | Real Estate Professionals | Homeowners | Service Contractors | Media
Center | Contact Us
Account Executive Search | Testimonials | Privacy Policy | Site Disclaimer | (c) 2012, Old
Republic Home Protection

# EXHIBIT D



1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                    **SOUTHERN DISTRICT OF CALIFORNIA**

9

10 | EMILY DIAZ, on behalf of herself and all       CASE NO. 09-CV-0775 H (WMC)

11 | others similarly situated,                       **ORDER GRANTING IN PART**

                          Plaintiff,                **AND DENYING IN PART**

12 |     vs.                                        **DEFENDANT'S MOTION TO**

13 |                                             **DISMISS**

FIRST AMERICAN HOME BUYERS

14 | PROTECTION CORPORATION, a

    California corporation,

15

                              Defendant.

16

17       On August 7, 2009, Defendant First American Home Buyers Protection Corporation

18 filed a motion to dismiss certain causes of action in Plaintiff's First Amended Complaint

19 ("FAC"). (Doc. No. 17.) On September 8, 2009, Plaintiff filed her opposition to Defendant's

20 motion to dismiss. (Doc. No. 20.) On September 14, 2009, Defendant filed a reply in support

21 of its motion. (Doc. No. 21.)

22       The Court held a hearing on September 21, 2009. Brett M. Weaver of Johnson Bottini,

23 LLP appeared for Plaintiff. Leanna M. Anderson and Joel D. Siegel of Sonnenschein Nath &

24 Rosenthal LLP, and Ross H. Hyslop of McKenna Long and Aldridge appeared for Defendant.

25 After due consideration and for the following reasons, the Court GRANTS in part and

26 DENIES in part Defendant's motion.

27 ///

28 ///

                                                                   09cv775

### Background

Defendant First American Home Buyers Protection Corporation ("First American") is a California corporation in the business of selling home warranty plans providing for the repair or replacement of household appliances that become inoperable due to normal wear and tear during the term of the contract. (FAC ¶¶ 9, 22.) Plaintiff holds several home warranty plans issued by First American. (Id. ¶ 8.) After Defendant allegedly improperly denied two of Plaintiff's claims, Plaintiff filed a Class Action Complaint in the Superior Court of the State of California for the County of San Diego. (Doc. No. 1.) Plaintiff alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Consumer Legal Remedies Act ("CLRA"), violation of the California Business and Professions Code § 17200, intentional misrepresentation and concealment, and false promise. (Doc. No. 1.)

On April 15, 2009, Defendant removed the action to this Court under the Class Action Fairness Act, 28 U.S.C. § 1332(d). (Doc. No. 1.) Defendant then moved to dismiss all of Plaintiff's claims except her breach of contract and implied covenant claims. (Doc. No. 6.) The Court dismissed Plaintiff's third cause of action based on the violation of the Consumer Legal Remedies Act and denied leave to amend, dismissed Plaintiff's § 17200 claim to the extent it relied on Defendant's alleged violations of California Insurance Code § 790 et seq. or the CLRA, and dismissed without prejudice Plaintiff's intentional misrepresentation and concealment, and false promise claims. (Doc. No. 15.) Plaintiff filed the FAC on July 24, 2009. (Doc. No. 16.)

The FAC alleges that First American engages in a variety of improper practices in addressing customers' claims. Specifically, Plaintiff alleges that Defendant: uses unlicensed, unqualified third party contractors, trains its contractors to deny legitimate warranty claims based on pretextual reasons, financially incentivizes its contractors to perform substandard repairs, deny legitimate claims, and refuse to work on expensive jobs, and uses delay tactics in hopes that the homeowner will eventually give up its claim. (FAC ¶¶ 4, 28-37.) These allegations form the basis of Plaintiff's causes of action for (1) breach of contract, (2) breach

1  of implied covenant of good faith and fair dealing, (3) violation of the California Business &

2  Professions Code § 17200, (4) intentional misrepresentation and concealment, (5) negligent

3  misrepresentation and concealment, and (6) false promise in violation of California Civil Code

4  § 1710.

5       Defendant seeks to dismiss parts of the FAC under Federal Rules of Civil Procedure 9,

6  12(b)(1) and 12(b)(6). Defendant moves to dismiss Plaintiff's claim for violation of California

7  Business & Professions Code § 17200 to the extent that it relies on fraudulent

8  misrepresentations or concealment, California Insurance Code §§ 330 et seq., and California

9  Business and Professions Code § 7000, et seq., and to the extent Plaintiff lacks standing. (Doc.

10  No. 17, Attach. 1 at 1.) Defendant also moves under Federal Rule of Civil Procedure 12(b)(6)

11  for dismissal of Plaintiff's claims for intentional and negligent misrepresentation and false

12  promise. (Id.)

13                                    **Discussion**

14  **I.  Motion to Dismiss Pursuant to 12(b)(6)**

15       A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests

16  the legal sufficiency of the claims asserted in the complaint. Navarro v. Black, 250 F.3d 729,

17  731 (9th Cir. 2001). A complaint generally must satisfy only the minimal notice pleading

18  requirements of Federal Rule of Civil Procedure 8(a)(2) to evade dismissal under a Rule

19  12(b)(6) motion. Porter v. Jones, 319 F.3d 483, 494 (9th Cir. 2003). Rule 8(a)(2) requires that

20  a pleading stating a claim for relief contain "a short and plain statement of the claim showing

21  that the pleader is entitled to relief." The function of this pleading requirement is to "give the

22  defendant fair notice of what the . . . claim is and the grounds upon which it rests." Conley v.

23  Gibson, 355 U.S. 41, 47 (1957). "While a complaint attacked by a Rule 12(b)(6) motion to

24  dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

25  'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a

26  formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v.

27  Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964–65 (2007).

28       A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual

- 3 -

1   enhancement.'" <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (<u>quoting id.</u> at 556). "Factual

2   allegations must be enough to raise a right to relief above the speculative level." <u>Twombly</u>,

3   127 S.Ct. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp.

4   235–36 (3d ed. 2004)).   "All allegations of material fact are taken as true and construed in the

5   light most favorable to plaintiff. However, conclusory allegations of law and unwarranted

6   inferences are insufficient to defeat a motion to dismiss for failure to state a claim." <u>Epstein</u>

7   <u>v. Wash. Energy Co.</u>, 83 F.3d 1136, 1140 (9th Cir.1996); <u>see also</u> <u>Twombly</u>, 127 S.Ct. at

8   1964–65.

9          In general, the scope of review on a motion to dismiss for failure to state a claim is

10   limited to "allegations contained in the pleadings, exhibits attached to the complaint, and

11   matters properly subject to judicial notice." <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 763 (9th Cir.

12   2007).   The Court applies this standard to each of Plaintiff's challenged causes of action.

13   **II.  Plaintiff's Fraud Allegations**

14          Plaintiff is basing her third, fourth, fifth and sixth causes of action in part on

15   Defendant's fraudulent statements. Under Federal Rule of Civil Procedure 9, a Plaintiff must

16   plead fraud with particularity.   "Rule 9(b)'s particularity requirement applies to state-law

17   causes of action." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103 (9th Cir. 2003).

18   "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the

19   misconduct charged." <u>Id.</u> at 1106 (<u>quoting</u> <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th

20   Cir.1997)). "'[A] plaintiff must set forth more than the neutral facts necessary to identify the

21   transaction. The plaintiff must set forth what is false or misleading about a statement, and why

22   it is false.'" <u>Id.</u> at 1006 (<u>quoting</u> <u>Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)</u>, 42

23   F.3d 1541, 1548 (9th Cir.1994)). On a claim for fraud, then, a "pleading is sufficient under rule

24   9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an

25   adequate answer from the allegations." <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d

26   531, 540 (9th Cir. 1989)(citations omitted). "While statements of the time, place and nature of

27   the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud" are not.

28   <u>Id.</u> Further, Rule 9(b) requires a plaintiff to attribute particular fraudulent statements or acts

1 | to individual defendants. Id.

2 |     Plaintiff bases her fraud allegations on Defendant's four statements:

3 |     (1) "From the very first day your coverage begins, your budget and home will be safe-
4 | guarded against costly, unexpected expenses for repairs and replacements on many of your
5 | home's most critical systems and appliances."

6 |     (2) "This contract provides coverage for unknown defects if the defect or malfunction
7 | would not have been detectable to the buyer, seller, or agent through visual inspection or
8 | simple mechanical test.  This contract provides coverage for systems and appliances which
9 | malfunction due to lack of maintenance, rust or corrosion, or chemical or sedimentary
10 | buildup."

11 |     (3) "The customer pays the $55 service call fee for each separate trade call.  Trade call
12 | means each visit by an approved contractor, unless multiple visits are required to remedy the
13 | same problem.  The Company warrants its work for 30 days.  If the item fails outside this time
14 | period, an additional service fee will be charged."

15 |     (4) "We'll send one of our pre-screened, certified, service technicians to your home to
16 | take care of the problem."

17 | (FAC ¶ 39.)

18 |     Plaintiff fails to adequately plead facts showing that the first, third and fourth statements
19 | were false – or even capable of falsity.  Defendant's statements contain no "concrete
20 | representations concerning objective and measurable facts," but instead is more akin to
21 | puffery, which is defined as "generalized, vague and unspecific assertions," and is not
22 | actionable in fraud or misrepresentation claims. Glen Holly Entm't, Inc. v. Tektronix Inc., 343
23 | F.3d 1000, 1015 (9th Cir. 2003).

24 |     Plaintiff has satisfied the requirement of pleading fraud with particularity as to the
25 | second statement. The Defendant's statement contains more than subjective, "vague and
26 | unspecific assertions". Id. Plaintiff alleges that Defendant routinely denied claims as "pre-
27 | existing conditions" even if those claims could not have been detected at the time the contract
28 | was entered into.  Plaintiff also alleges the statements were misleading because Defendants

1  routinely denied claims for pretextual reasons, including lack of maintenance, rust, and

2  corrosion, even if those were not the cause of the malfunction. (Id.)

3  Accordingly, the Court DENIES Defendant's motion to dismiss the third, fourth, fifth and sixth

4  causes of action to the extent they rely on alleged fraudulent representations.

5  **III. Plaintiff's Claim for Concealment**

6       Plaintiff's fourth and fifth causes of action assert claims for concealment. (FAC ¶¶ 60-

7  70.) Plaintiff argues that Defendant owed a duty to Plaintiff to disclose all material facts under

8  section 332 of California Insurance Code, because their home warranty contract was a contract

9  of insurance. (FAC ¶ 38.) The parties disagree as to whether the contract at issue is an

10  insurance contract.[1]  Because the Court finds that Plaintiff failed to state a claim of

11  concealment, the Court need not decide whether the home warranty contract at issue qualifies

12  as a contract of insurance.

13       Section 330 of the California Insurance Code provides: "Neglect to communicate that

14  which a party knows, and ought to communicate, is concealment." Cal. Ins. Code § 330.

15  Furthermore, section 332 of the California Insurance Code provides: "Each party to a contract

16  of insurance shall communicate to the other, in good faith, all facts within his knowledge

17  which are or which he believes to be material to the contract and as to which he makes no

18  warranty, and which the other has not the means of ascertaining." Id. § 332.

19       Plaintiff alleges that Defendant concealed the following facts: (1) Defendant uses

20  unlicensed contractors; (2) Defendant pays its contractors so far below market rate that the

21  contractors cannot perform adequate or necessary repairs and replacements; (3) Defendant

22  trains its employees to deny legitimate warranty claims based on pre-textual reasons; (4)

23  Defendant routinely denies claims for pre-textual reasons during the first year a homeowner

24  has a warranty plan without any evidence that the problem was caused by the reason given for

25

26       [1] Plaintiff argues that this Court has previously ruled that the home warranty contracts are
27  contracts of insurance. (FAC ¶ 38.) Plaintiff relies on the Court's order dated June 22, 2009, which
     stated that "the Court is not convinced that Defendant's warranty plans are not insurance." (Doc. No.
     15 at 6.) Defendant argues that it had no duty to disclose the facts in question, because the contract
28  in question was not insurance, and, in any case, there is no fiduciary relationship between an insured
     and the insurer. (Doc. No. 17, Attach. 2 at 11.)

1   the denial; (5) Defendant financially incentivizes its contractors to deny legitimate claims

2   and/or perform substandard repairs; (6) Defendant creates economic incentives for contractors

3   to shift the cost of repair or replacement onto the consumer; and (7) Defendant routinely delays

4   authorizing repairs or purchasing necessary equipment. (FAC ¶ 38.)

5        Plaintiff fails to plead that a reasonable consumer would not have ascertained any of the

6   alleged concealed facts. (Doc. No. 17, Attach. 2 at 12.)  In fact, the FAC quotes several online

7   consumer complaints about Defendant's alleged bad practices. (FAC ¶ 3.)  Specifically, the

8   consumer complaints warn that Defendant "is using F rated contractors" and "gives most of

9   the work to the cheapest contractors first, [who] keep their 'cheap status' by lying to the

10  customers and claiming 'improper installation' 'not normal wear and tear'...." (FAC, Ex. A,

11  B.) Consumers have also complained that after filing several service requests, "[a]ll [they] got

12  were excuses and delays," and that Defendant "claim[ed] all repairs are due to 'improper

13  installation" and "always [had] an excuse that this or that is not covered." (Id.) Because

14  Plaintiff offered numerous consumer comments about Defendant, Plaintiff fails to show that

15  she would not have been able to ascertain some of these alleged facts.  Additionally, Plaintiff

16  does not plead the facts of alleged fraudulent concealment with required specificity.

17       Counsel for Plaintiff represented to this Court that Plaintiff has no additional facts to

18  support the claim of concealment.  Accordingly, no further amendments are warranted at this

19  time. Because the FAC fails to allege sufficient facts as to fraudulent concelament, the Court

20  GRANTS Defendant's motion and dismisses Plaintiff's claim for fraudulent concealment.  If

21  in the course of discovery Plaintiff learns additional facts, Plaintiff may seek leave to amend

22  her pleadings.

23  **IV.  Plaintiff's § 17200 Unfair Competition Law Claim**

24       Plaintiff's third cause of action alleges that Defendant's conduct violated § 17200 of the

25  California Business and Professions Code. (FAC ¶¶ 52-59.)  Section 17200 defines "unfair

26  competition" to include "any unlawful, unfair or fraudulent business act or practice." Cal. Bus

27  & Prof. Code § 17200.  This language covers "anything that can properly be called a business

28  practice and that at the same time is forbidden by law." <u>Rubin v. Green</u>, 4 Cal. 4th 1187, 1200

1  (1993) (quotation omitted).  Thus, the statute effectively "borrows violations of other laws and

2  treats them as unlawful practices" that are "independently actionable."  Cel-Tech Commc'ns,

3  Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999) (quotation omitted).  In

4  addition, § 17200 may penalize a practice as "unfair" or "fraudulent" even if that practice is

5  otherwise lawful.  Id.  The statute also proscribes "unfair, deceptive, untrue or misleading

6  advertising."  Cal. Bus. & Prof. Code § 17200.

7        Plaintiff alleges Defendant's conduct violated California Insurance Code §§ 330, 331,

8  332 and 334, because Defendant concealed material facts about its business practices in order

9  to induce Plaintiff to enter into the home warranty contracts.  (Id. ¶ 57.)  Plaintiff also alleges

10  that defendant violated California Business and Professions Code §§ 7000 et seq., because

11  Defendant employed unlicensed contractors.  (Id. ¶ 58.)  Defendant challenges Plaintiff's third

12  cause of action to the extent it relies on fraudulent representations or concealment, upon

13  California Insurance Code §§ 330 et seq., and upon California Business and Professions Code

14  § 7000, et seq.  (Doc. 17, Attach.2 at 1.)

15  **A. Violation of California Insurance Code §§ 330 et seq.**

16        The Court addressed Plaintiff's claims of fraudulent concealment above, and concluded

17  that Plaintiff has not plead sufficient facts to make out a claim for concealment.  To the extent

18  Plaintiff's claim under § 17200 relies on the violation of California Insurance Code §§ 330 et.

19  seq., Plaintiff's claim fails.  The Court GRANTS Defendant's motion and dismisses Plaintiff's

20  claim for violation of section 17200 to the extent it relies on violation of section 330.  If in the

21  course of discovery Plaintiff learns additional facts, Plaintiff will be able to seek leave to

22  amend her pleadings.

23  **B. Violation of Business and Professions Code §§ 7000 et seq.**

24        Defendant also challenges Plaintiff's reliance on the California Business and

25  Professions Code § 7000 et seq. to support her third cause of action.  Section 7028 of the

26  Business and Professions Code provides: "It is a misdemeanor for any person to engage in the

27  business or act in the capacity of a contractor within this state without having a license

28  therefor, unless the person is particularly exempted from the provisions of this chapter."  Cal.

1  Bus. & Prof. Code § 7028(a).  A "contractor" is "synonymous with 'builder' and [includes]

2  any person who undertakes to ... construct, alter, repair, add to, subtract from, improve, move,

3  wreck or demolish any building, highway, road, parking facility, railroad, excavation or other

4  structure, project, development or improvement..." Cal. Bus. & Prof. Code §7026(a).

5       Plaintiff alleges that because Defendant employed unlicensed contractors, it aided and

6  abetted contractors who violated the statute. (FAC ¶ 58.)  Defendant argues that the state

7  license requirement applies only to "contractors" within the meaning of the Business and

8  Professions Code, and does not apply to Defendant. (Doc. No. 17, Attach. 2 at 14.) Defendant

9  also argues that Plaintiff failed to state a claim for aiding and abetting. (Id.)

10       In order to state a claim for aiding and abetting under California law, a plaintiff "must

11  plead that the alleged aider and abettor (1) knew that the other's conduct constituted a breach

12  of a duty and (2) gave substantial assistance or encouragement to the other so to act."

13  Velazquez v. GMAC Mortg. Corp., 605 F. Supp.2d 1049, 1068 (C.D. Cal. 2008) (citing In re

14  First Alliance Mortgage Co., 471 F.3d 977, 995-96 (9th Cir.2006)). Here, the FAC alleges that

15  Defendant aided and abetted because it "employ[ed] unlicensed contractors under independent

16  contractor agreements." (FAC ¶ 58.) This allegation, without more, is insufficient to survive

17  a motion to dismiss. Plaintiff states no facts to demonstrate that Defendant had actual

18  knowledge of the alleged statutory violation. Furthermore, Plaintiff has not alleged any facts

19  support her allegation that the contractors employed by Defendant are "contractors" within the

20  meaning of section 7026 of the Business and Professions Code.

21       Accordingly, the Court GRANTS Defendant's motion to dismiss the third cause of

22  action to the extent it is based on the violations of California Insurance Code and California

23  Business and Professions Code.

24  **V. Defendant's Motion to Dismiss Pursuant to 12(b)(1)**

25       Defendant also moves to dismiss parts of Plaintiff's FAC under Federal Rule of Civil

26  Procedure 12(b)(1) for lack of subject matter jurisdiction. Defendant asserts that Plaintiff

27  failed to assert facts that establish her standing. (Doc. No. 17.) According to Defendant,

28  Plaintiff failed to state that she has been personally harmed by Defendant's alleged wrongful

1  conduct. (Id.) Specifically, Defendant argues that because Plaintiff was not personally harmed

2  by some of the Defendant's alleged wrongdoing, she cannot bring her claims. (Id.)

3      "For purposes of ruling on a motion to dismiss for want of standing, both the trial and

4  reviewing courts must accept as true all material allegations of the complaint, and must

5  construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501

6  (1975); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The court does not

7  "speculate as to the plausibility of the plaintiff's allegations." Western Center for Journalism

8  v. Cederquist, 235 F.3d 1153, 1154 (9th Cir.2000).

9      Article III, §2 of the Constitution places the case or controversy limit on the federal

10  judiciary. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has

11  suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent,

12  not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

13  defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

14  redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Environmental Servs.

15  (TOC) Inc., 704, 528 U.S. 167, 179 (2000). A plaintiff attempting to state a claim for violation

16  of a statute must allege facts showing not only her Article III standing, but that the statute in

17  question grants her the right to sue. Cetacean Cmty. v. Bush, 386 F.3d 1169, 1175 (9th Cir.

18  2004).

19      Plaintiff has alleged sufficient personal injury to establish standing. (FAC ¶¶ 25-27.)

20  Plaintiff alleges that she is a holder of several warranty plans issued by Defendant. (Id. ¶ 8.)

21  Plaintiff alleges that on two occasions, Plaintiff's claims were improperly denied by

22  Defendant. (Id. ¶25.) A class representative who has a direct and substantial interest has

23  standing; "the question whether they may be allowed to present claims on behalf of others who

24  have similar, but not identical, interests depends not on standing, but on an assessment of

25  typicality and adequacy of representation." 7AA Wright & Miller, Federal Practice and

26  Procedure § 1785.1 (3d ed. 2005). Because Defendant's motion attacks the typicality of

27  Plaintiff's claims and the adequacy of her representation, the motion is premature.

28  Accordingly, the Court DENIES Defendant's motion to dismiss the FAC or parts of it for lack

1    of standing.

2                 <u>**Conclusion**</u>

3        For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's

4    motion to dismiss.  Accordingly, the Court dismisses Plaintiff's § 17200 claim to the extent

5    it relies on the violations of section 300 et seq. of the California Insurance Code and section

6    7000 et seq. of the California Business and Professions Code.  The Court dismisses Plaintiff's

7    fourth cause of action to the extent it relies on fraudulent concealment.  The Court dismisses

8    Plaintiff's fifth cause of action to the extent it relies on fraudulent concealment.  Defendant is

9    ordered to file an answer to the FAC within thirty (30) days of this Order.

10   **IT IS SO ORDERED.**

11   DATED: September 21, 2009

12

13                                  MARILYN L. HUFF, District Judge
                                 UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv775

# EXHIBIT E

1  JOHNSON BOTTINI, LLP
   Francis A. Bottini, Jr. (CA 175783)
2  frankb@johnsonbottini.com
   Frank J. Johnson (CA 174882)
3  frankj@johnsonbottini.com
   Brett M. Weaver (CA 204715)
4  brett@johnsonbottini.com
   655 West Broadway, Suite 1400
5  San Diego, California 92101
   Telephone:  (619) 230-0063
6  Facsimile:  (619) 233-5535

7  Counsel for Plaintiffs

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF SAN DIEGO

10  KARON AND L.B. CHIP EDLESON, On    ) Case No. 37-2007-00071725-CU-BT-CTL
    Behalf of Themselves and All Others Similarly )
11  Situated,                           )
                                        ) PLAINTIFFS' NOTICE OF ENTRY OF
12            Plaintiffs,               ) ORDER
                                        )
13  v.                                  )
                                        )
14  AMERICAN HOME SHIELD OF             )
    CALIFORNIA, INC., AMERICAN HOME     )
15  SHIELD CORPORATION, THE             )
    SERVICEMASTER COMPANY, AND DOES     )
16  1-20,                               )
                                        )
17            Defendants.               )
                                        )

18

19

20

21

22

23

24

25

26

27

28

1  |  TO THE COURT, THE PARTIES AND ALL COUNSEL OF RECORD:

2  |       PLEASE TAKE NOTICE that on October 18, 2007, the court adopted the attached tentative

3  |  ruling as the final order of the court on Defendants' demurrer and Motion to Strike the Class Action

4  |  Allegations from Plaintiffs' Complaint.

5  |  DATED: March 20, 2008

JOHNSON BOTTINI, LLP

FRANCIS A. BOTTINI, JR.

FRANCIS A. BOTTINI, JR.
FRANK J. JOHNSON
BRETT M. WEAVER
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone: (619) 230-0063
Facsimile:  (619) 233-5535

Counsel for Plaintiffs

- 1 -

PLAINTIFFS' NOTICE OF ENTRY OF ORDER

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SAN DIEGO
HALL OF JUSTICE

TENTATIVE RULINGS - October  18, 2007

EVENT DATE: 10/19/2007          EVENT TIME: 10:30:00 AM          DEPT.: C-73
JUDICIAL OFFICER: Steven R. Denton

CASE NO.:   37-2007-00071725-CU-BT-CTL
CASE TITLE: EDLESON VS. AMERICAN HOME SHIELD OF CALIFORNIA, INC

CASE CATEGORY:   Civil - Unlimited          CASE TYPE:  Business Tort

EVENT TYPE:  Demurrer / Motion to Strike
CAUSAL DOCUMENT/DATE FILED:   Motion to Strike, 09/10/2007

Defendants AMERICAN HOME SHIELD OF CALIFORNIA, INC. and AMERICAN HOME SHIELD
CORPORATION'S general demurrers to each cause of action of the Complaint are OVERRULED,
and defendants are ordered to file and serve their Answers within ten days of the date of this
hearing.

Regarding the first cause of action, the covenant of good faith and fair dealing, implied by law in every contract, exists
merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the
agreement actually made. *Guz v. Bechtel National, Inc.* (2000) 24 Cal. 4th 317, 349. The covenant thus cannot be
endowed with an existence independent of its contractual underpinnings. *Id.* It cannot impose substantive duties or limits
on the contracting parties beyond those incorporated in the specific terms of their agreement. *Id.* at 349-350. The terms
of the implied covenant should never be read to vary express terms. *Carma Developers, Inc. v. Marathon Development
California, Inc.* (1992) 2 Cal. 4th 342, 374. As alleged, defendants sold plaintiffs home warranty protection plans to
ostensibly offer warranties for the protection of various home appliances. However, paragraphs 35-39, 45 and 46 allege
that defendants undertook actions to frustrate plaintiffs' rights under the contract regarding the good faith repair or
replacement of their home appliances.

Regarding the second cause of action, whether the Complaint uses the term "insurance" is immaterial. This is simply a
legal conclusion without significance, not a factual allegation. Based on the facts alleged, the court finds that the
contracts do not amount to insurance such that the CLRA does apply. See *Fairbanks v. Superior Court* (2007) 154 Cal.
App. 4th 435. Insurance is essentially a financial transaction, completely unrelated to the sale or lease of any identifiable
consumer good or service. *Id.* at 442. "An insurance contract is not something akin to a haircut, a plumbing repair, or a
two-year warranty on a microwave oven&#8212;it is simply an agreement to pay if and when an identifiable event
occurs." *Id.* Whether a contract can be defined as an insuring agreement depends on whether the assumption of risk
(which normally defines an insuring agreement) is the principal object and purpose of the contract. *Title Insurance Co. v.
State Board of Equalization* (1992) 4 Cal. 4th 715, 726-727 (indemnification provision secondary to main object and
purpose of the underwriting agreements). As alleged in this action, the main object of the agreement is to provide quality
repairs for appliances. This is the rendition of services, not a purely financial transaction.

Regarding the third cause of action, the UCL defines "unfair competition" as any "unlawful, unfair or fraudulent business
act or practice and unfair, deceptive, untrue or misleading advertising...." Business & Professions Code § 17200. This
statutory language makes clear that a practice may be deemed unfair even if not specifically proscribed by some other
law, *Cel-Tech Communications v. L.A. Cellular Telephone Co.* (1999) 20 Cal. 4th 163, 180. Section 17200 is written in
the disjunctive such that it establishes three varieties of unfair competition. In other words, a practice is prohibited as
"unfair" or "deceptive" even if not "unlawful" and vice versa. *Id.* A CLRA violation can give rise to a UCL claim as well.
See *Brockey v. Moore* (2003) 107 Cal. App. 4th 86, 98. Whether a business practice is unfair involves an examination of

---

E-32

CASE TITLE:   EDLESON VS. AMERICAN HOME SHIELD OF CALIFORNIA, INC        CASE NUMBER:   37-2007-00071725-CU-BT-CTL

that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. *South Bay Chevrolet v. GM Acceptance Corp.* (1999) 72 Cal. App. 4th 861, 886. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. *Id.* In this action, plaintiffs have sufficiently alleged facts amounting to a violation of the UCL under the unfairness prong, and also because defendants' actions allegedly violates the CLRA. Given this finding, it is not necessary to address whether the UCL violation can be premised on Insurance Code Violations.

Defendant THE SERVICEMASTER COMPANY'S separate unopposed general demurrer to the entire Complaint is SUSTAINED. A plaintiff seeking to hold a parent corporation liable for the acts or omissions of its subsidiary has a heavy burden to meet. *Laird v. Capital Cities/ABC* (1998) 68 Cal. App. 4th 727, 737. Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result. *Id.* Paragraphs 9 and 24 allege that ServiceMaster is the parent of the AHS entities, but no other facts are alleged regarding ServiceMaster's liability. This ruling completely disposes of this action, as against defendant ServiceMaster, and it is entitled to a judgment in its favor.

Defendants AMERICAN HOME SHIELD OF CALIFORNIA, INC., AMERICAN HOME SHIELD CORPORATION and THE SERVICEMASTER COMPANY'S
motion to strike various class action allegations is DENIED. Two requirements must be met to sustain a class action. *Blakemore v. Superior Court* (2005) 129 Cal. App. 4th 36, 52. The first is existence of an ascertainable class, and the second is a well-defined community of interest in the questions of law and fact involved. *Id.* The second requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. *Id.* at 52-53. A demurrer to class allegations may be sustained only where it is clear there is no reasonable possibility that plaintiffs could establish a community of interest among the potential class members, and that individual issues predominate over common questions of law and fact. *Id.* at 53. Whenever there is a reasonable possibility plaintiffs can plead a prima facie community of interest among class members, the preferred course is to defer decision on the propriety of the class action until an evidentiary hearing has been held on the appropriateness of class litigation. *Id.* In this case, all of the prerequisites of class certification have been alleged at paragraphs 14 through 23. Elsewhere in the Complaint, it is essentially alleged that defendants employed a common scheme to defraud its customers by routinely denying or delaying legitimate claims, by affording inadequate repairs, etc.

A state may constitutionally exercise jurisdiction over the claims of nonresident plaintiffs in a nationwide class action case where the named plaintiff adequately represents the absent class members' interests, and the members of the plaintiff class are given adequate notice, the opportunity to be heard and the opportunity to remove themselves from the class. *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal. App. 3d 605, 612. To apply its law constitutionally to the claims of nonresident class members, the forum state must have a significant contact or aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests in order to ensure that the choice of forum law is not arbitrary or unfair. *Id.* at 612-613. In this case, it is alleged that one the AHS entities is a California corporation, with principal places of business in Tennessee and California. Both defendants were licensed to conduct business in California. Based on these facts, there may be sufficient contacts by at least one defendant such that the nationwide class action is not completely improper.

AS A COURTESY TO THE COURT, IT IS REQUESTED THAT COUNSEL NOTIFY EACH OTHER AND THE COURT BY 4:30 P.M. THE DAY PRIOR TO DATE OF HEARING IF PARTIES ARE SUBMITTING TO THE TENTATIVE RULING.

1    Edleson v. American Home Shield of California, Inc. et al.
       Case No. 37-2007-00071725-CU-BT-CTL

2

                          **PROOF OF SERVICE**

3
                        [CCP 1013A (3) and 2015.5]

4
         I am employed in the City and County of San Diego, State of California. I am over the age of

5
   18 and not a party to the within action. My business address is 655 West Broadway, Suite 1400, San

6
   Diego, California 92101.

7
         On April 1, 2008, I caused to be served the attached:

8
         **PLAINTIFFS' NOTICE OF ENTRY OF ORDER**

9

10   ☒    [BY MAIL] I placed each such sealed envelope, with postage thereon fully prepaid for first-
           class mail, for collection and mailing at Johnson Bottini, LLP, San Diego, California, following

11        ordinary business practices. I am familiar with the firm's practice for collection and processing
           of correspondence, said practice being that in the ordinary course of business, correspondence is

12        deposited in the United States Postal Service the same day as it is placed for collection.

13   ☐    [BY FACSIMILE] The document stated herein was transmitted by facsimile transmission and
           the transmission was reported as complete and without error. A transmission report was

14        properly issued by the transmitting facsimile machine and a copy of said transmission report is
           attached to the original proof of service indicating the time of transmission.

15

16   ☐    [BY OVERNIGHT MAIL] I placed each such sealed Federal Express envelope, with a pre-paid
           airbill attached thereto and delivered the envelope to a Federal Express agent for delivery. A

17        true and correct copy of the airbill is attached hereto.

18   ☐    [BY HAND DELIVERY] I caused such envelope(s) to be delivered by hand to the addressee(s)
           designated.

19   ☐    [BY PERSONAL SERVICE] By causing the documents described above to be delivered by
           hand to on this date before 5:00pm.

20

21   ☐    [BY ELECTRONIC MAIL]: My electronic business address is kierstens@johnsonbottini.com
           and I caused such document(s) to be electronically mailed.

22

23    KIRBY NOONAN LANCE & HODGE LLP      Robert R. Gasaway
       DAVID J. NOONAN                      KIRKLAND & ELLIS, LLP

24    600 W. Broadway, Suite 1100           655 15th Street N.W.
       San Diego, California 92101-3387       Washington, DC 20005-5793

25

26

27

28

1

KIRKLAND & ELLIS LLP

2  MARTIN R. BOLES
    777 South Figueroa Street

3  Los Angeles, California 90017-5800

4  *Attorneys for Defendants American Home Shield of*
    *California, Inc. and American Home Shield Corporation*

5

6          I declare under penalty of perjury under the laws of the State of California, that the above is true

7  and correct.

8          Executed on April 1, 2008, at San Diego, California.

9                                                                          Cory Anders

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



- 1 -

PROOF OF SERVICE

E-35

# EXHIBIT F

August 31, 2004

Tony Cignarale
Chief, Consumer Services Division
California Department of Insurance
300 South Spring Street
Los Angeles, CA 90013

Re: Fair Claims Settlement Practices Regulations for Home Protection Companies ("Fair Claims Regs for HP")

Dear Mr. Cignarale,

On behalf of the Home Warranty Association of California ("HWAC"), a trade association of licensed home protection companies who write 95%+ of the home protection contracts in the state of California, I respectfully submit (per your request) real life examples of how particular regulations are difficult, unreasonable, overly burdensome or impossible to comply with by a home protection company.

We believe there are three fundamental differences between home protection contracts and insurance policies: 1) home protection contracts provide actual repair and replacement services to the contract holder; insurance polices provide monies, or other compensation to the insured; 2) home protection contracts cover the repair or replacement of residential systems and appliances that breakdown due to normal wear and tear, which will eventually happen to all systems and appliances after a fairly predictable period of time; insurance policies cover fire, theft, accidents, storms, and other sudden and fortuitous events; 3) home protection contract holders' requests for service are handled via the telephone without the need for claims forms and claims adjusters; insurance policies require the filing of forms and completion of paperwork and normally a claims adjuster inspecting the actual sight of the claim. These three fundamental differences and the need for Fair Claims Regs for HP will become evident as we review the RH399 Replacement Regulations.

We also believe it is helpful for you to review the draft Fair Claims Settlement Practices Regulations for California Home Protection Companies ("Draft Fair Claims Regs for HP") that is enclosed for your convenience.

With this background, we believe RH399 Replacement Regulations are intended to regulate a traditional insurance business, not the home protection business, and fail to take into consideration the unique aspects of the home protection business. In accordance with Insurance Code section 12743(k), the RH399 Regulations must be carefully construed with the nature of home protection companies and the home protection business.

*Page 2, Mr. Cignarale*

Section 2695.3(b) (1) and (2). File and Record Documentation

This section is intended to capture written claims data. Home Protection companies operate via telephone (primarily), e-mail (secondary and growing) and paper (least likely). The telephone is utilized to order a contract, request service, schedule an appointment, contractor diagnosis, and home protection company's discussion of coverage decision with the contract holder. This section references "documents", "date of loss", "date of payment of the claim", et al. These terms are not necessarily applicable to home protection companies: computer notes, date of request for service, date repair completed. A home protection company may not know when the scheduled appointment is made between the contractor and the contract holder, or the date of the initial repair, or even the completed repair, until an invoice is received by the home protection company from the contractor. The invoice is really an accounting document rather than a claim file document. Accounting verifies that the work was authorized by the home protection company; the amount is correct and then sends a check to the contractor, not the contract holder. The actual service request information and authorization for repair information has already been entered in computer notes from telephone conversations.

An example: A home protection company receives a request for service from a contract holder (via the telephone). It enters the request in its computer notes for the contract holder and initiates service by faxing/calling the repair contractor with the request, and again, enters this in the computer notes. The contractor schedules a mutually convenient appointment with the contract holder. On the date of the scheduled visit, the contractor will diagnose the problem and request authorization for the repair. The home protection company will make the coverage decision, authorize the covered repair and enter this information in the computer notes. In reviewing the terminology of Section 2695.3, we immediately note the problem with applying RH399 Replacement Regulations to home protection companies. The terms "date of loss", "date of payment of claim", "date of acceptance", "date closed without payment" do not apply to home protection companies. The information should request date of request for service, date home protection company initiated service, the date of diagnosis and coverage decision. The requirement in Section 2695.3 to record in the file the date the home protection company received, processed and transmitted material documents applies to the insurance policy claim form model of doing business, not the telephonic business model of home protection companies.

FYI: Section 2695.3(b) (3) has an error: "preceding" should be "subsequent". In addition, Section 2695.3(a) is written for a paper claims file and should clarify that a home protection company can comply with this requirement by utilizing computerized notes in accordance with the nature of the home protection business.

*Page 3, Mr. Cignarale*

Section 2695.5(c), (d) and (e). Duties upon Receipt of Communications

The written designation required by section (c) will definitely NOT work for home protection companies. Given that the home protection business is conducted primarily via the telephone and repair service is often needed that day, especially in an emergency situation (i.e. leaking water, extreme heat and no air conditioning), and service is often requested by real estate agents, attorneys, property managers, spouses, family members and tenants on behalf of the contract holder.
Section (d) does not apply to home protection companies. All requests for service are made directly to the home protection company via a convenient 800 number.

Section (e) is designed for a claims form filing process and providing sufficient documentation for proof of claim that again does not apply to the home protection business. Home protection companies receive request for service and enter notice of request for service in computer notes. No claims forms, no proof of claim forms. The contractor will diagnose the repair problem and the home protection company will issue the coverage decision.

Please note: Sections (a) and (b) are designed for insurance policies that have a claim once every few years (i.e. homeowners, automobile, et al), not an average of over 2 service requests per contract every single year. The goal of these two provisions should be for the home protection company to work with the Department of Insurance to help provide covered service to the contract holder first; then, an evaluation of the handling of the request for service second. There is a major difference in the business models between insurance and home protection companies. Insurance policies deal with claims for losses (i.e. money). Sections (a) and (b) ensure that the policyholder knows the status of his/her claim for monetary settlements; however, in the home protection business they do not necessarily help the contract holder obtain their needed covered repair (i.e. each home protection company could have a designated customer service person/department who can work with the Department of Insurance to ensure covered service is provided within the terms and conditions of the contract).

2695.6 Training and Certification

This section again is drafted for an insurance company that utilizes "claims agents" who investigate the cause of the loss after the fact. For home protection companies, this section needs to clearly designate training and certification for a home protection companies' customer service representative who "investigates" the request for service by reviewing the diagnosis from the contractor and ultimately making the coverage decision. Unfortunately, this provision is written for the insurance company business models that send 3rd party "claims agents" who investigate the claim and report back. The home protection company utilizes contractors to diagnose the service problem; contractors are

*Page 4, Mr. Cignarale*

not necessarily trained and certified to understand home protection contracts. The requirement to train and certify contractors would be overly burdensome, extremely expensive and virtually impossible. This provision definitely needs to be clarified to ensure clear understanding of who needs to be trained and certified.

Section 2695.7 (b), (b) (1), (c) (1), (d), (g) and (l). Standards for Prompt, Fair and Equitable Settlements

Section (b) states that the "amounts accepted or denied shall be clearly documented". This again is intended for insurance policies that pay a monetary amount for a covered loss. Home protection companies provide for a covered repair or replacement. This provision needs to be modified to address the home protection business.
Section (b) (1) requires that a written denial letter be sent to the policyholder. This works well for insurance companies who utilize written claim forms and have per policy claim rate of once every few years; however, this presents a completely different burden on the home protection companies. First, the business is conducted via the telephone and this requirement should be fulfilled in the normal course of business by telephone and enter this data into the computer notes. In the event a customer disputes a coverage decision and the customer requests an explanation in writing, the home protection company can send a written denial letter. Providing a written denial letter on every single denial of coverage (especially undisputed denials) is extremely burdensome on home protection companies.

Section (c) (1) should be modified to allow a home protection company the ability to leave a telephone message that is entered into the computer notes. Again, written claims forms, denial letters and notices are NOT part of the nature of the home protection business that is conducted virtually entirely by telephone.

Section (d) potentially presents a different contractual obligation upon a home protection company than that provided pursuant to Section 12740, et al., and the underlying home protection contract. A home protection company performs a "thorough investigation" of the specific repair requested. A home protection company does not have the contractor diagnose the entire plumbing or air conditioning system, only the specific repair requested. Again, this provision is written for an insurance company investigating a loss, thus a thorough inspection of what caused the loss. The inspection may require the inspection of the entire house in the event of a house fire (versus a diagnosis of a requested repair versus an inspection of the entire system).

Section (g) fails to contemplate information presented by the repair contractor; information that is absolutely critical to a home protection company. Needless to say, a repair contractor is not a claims adjuster.

Section (l) needs to clarify to enable home protection companies to enter computer notes (versus paper claims files).

*Page 5, Mr. Cignarale*

In conclusion, the members of HWAC are not opposed to the fair and appropriate regulation of the home protection industry. However, as outlined above, RH399 Replacement Regulations fail to address the fundamental differences between the insurance industry and the home protection industry and create, in significant part, will be difficult, unreasonable, overly burdensome, and in certain instances, impossible to comply with by a home protection company.

On behalf of the HWAC, I respectfully submit these comments on RH399 Replacement Regulations for your review and consideration. We believe it would be both beneficial and productive to meet with appropriate representatives at the California Department of Insurance to discuss these comments and to address our concerns with implementation of RH399 Replacement Regulations on home protection companies. I appreciate your time and attention to this important matter.

Respectfully submitted,

Home Warranty Association of California

Mark F. Lightfoot
President

cc: Sean McCarthy, Esq.
    John Benton, Esq.
    Ray Adams
    Phil Esser
    Dave Jasco
    Bill Jensen
    Dan Langston
    Lorna Mello